Application for probate of matter which is alleged to be the nuncupative will of JOB MALE, deceased.

1. It is essential to the establishment of a nuncupative will that it shall, among other things, clearly appear:

(a) That at the time of uttering the words relied on, the testator had a present consistent intention that the very words uttered should constitute his will, and that the witnesses so understood his language.

Male's Case.

(b) That the testator shall, by his own language, before pronouncing the will, have indicated to those about him, or some of them, that they were to witness that the very words he presently uttered were to constitute his last testament.

2. M., being *in extremis*, sent for C., his legal adviser, to draw his will, and gave him instructions, which were noted by C., with lead pencil, in abbreviated memoranda. When they were completed, C. said to three persons present, who had heard the instructions: "Mr. M. wants you as witnesses. Is that so, Mr. M.?" To which M. replied, "Yes," whereupon the persons addressed stepped to the bedside. Then C., guided by the memoranda, recited the substance of the instructions, and asked M. whether that which he had recited was "correct," or "all," or his "will" (the proofs leaving his exact language, at this point, in controversy), to which M. replied in the affirmative. C. then immediately sat down and wrote out a formal will, with pen and ink, and read it over to M., who died before it could be executed.—*Held*, that there was no nuncupative will, the intent to nuncupate and the *rogatio testium*, which the law requires, not being established.

3. A document drawn in pursuance of instructions by an intending testator, for the purpose of being executed as a written will, but unexecuted solely because death unexpectedly intervened, cannot be established in this state, as a nuncupative will.

———

The present controversy arises upon the petition of Job Male, George W. Fenno and John W. Harrison, for probate of an alleged nuncupative will of Job Male, deceased, in which they were named as executors. Upon presentation of the petition, citations were issued to the next of kin and heirs at law, two of whom had theretofore filed caveats against the admission to probate of anything purporting to be a will of the decedent, named. Depositions have been regularly taken, upon which this matter is brought to hearing.

*Mr. Craig A. Marsh* and *Mr. Joseph D. Bedle*, for the proponents.

*Mr. Theodore Runyon*, for Charlotte L. Strathdale and Robert A. Male.

*Mr. Richard V. Lindabury*, for Charles H. Male and others.

*Mr. Foster N. Voorhees*, for George Male and others.

Mr. *William M. Stillman*, for the Plainfield Public Library, Mary A. Gleason and others.

Mr. *Charles A. Reed*, for Sarah A. Delaney.

Mr. *Nelson Runyon*, for Sarah Stout.

THE ORDINARY.

Job Male died a childless widower, in his residence at Plainfield, where he had lived for several years, on the night of the 29th of January, 1891, aged about eighty-two years. He left an estate which is estimated to be worth more than half a million dollars, of which $60,000 is in personalty and the remainder is in realty.

The matter offered for probate as his nuncupative will, was had a little more than half an hour before his death. Early in the evening his attending physician, Thomas S. Davis, deeming him to be in a critical condition of health, called Dr. George W. Endicott in consultation. Almost immediately the two physicians concluded that Mr. Male's life was, at best, limited to a few hours, and they so advised the inmates of the house. One of the proponents, Job Male, Jr., a nephew of the decedent, thereupon suggested that his uncle had previously expressed to him a desire to make a will, and Dr. Endicott at once proceeded to the residence of Craig A. Marsh, who had been Mr. Male's legal adviser in several matters, and called him to Mr. Male's bedside. Mr. Marsh, responding to the summons, reached Mr. Male's shortly after nine o'clock. Entering the bed-chamber he approached the bedside and asked Mr. Male if he recognized him, to which Mr. Male replied, " Yes, this is Mr. Marsh." There were then present in the room the two physicians, Job Male, Jr., the nephew; Augustus C. Baldwin, a neighbor; Sarah Stout, an old lady, the sister of Mr. Male's deceased wife, who kept house for Mr. Male; Gertrude A. Fenno, a niece of Mr. Male, and her husband, one of the proponents.

After expressing sympathy with the sick man, Mr. Marsh said that he understood that he, Mr. Male, desired to make a will, and

that he had sent for him, Marsh, to "attend to it," as one of the witnesses testifies, or "to draw it," as two other of the witnesses have testified.    To whatever was said Mr. Male replied in the affirmative.    Then Mr. Marsh produced paper and pencil and sat down at the bedside.    He first asked Mr. Male how he, Male, desired his property to go, to which Male replied that he desired his brothers' children to share it equally, but first, that he wished to give his Park avenue house to the Plainfield Public Library.    Mr. Marsh asked the number of the house, and Male replied, "One hundred and twenty."    Mr. Marsh then asked, "What else?"    Male replied that he would give three lots on College place to the library.    Mr. Marsh asked if he could give the numbers of the lots, and Male replied, "Yes, 9, 11 and 13."    Mr. Marsh then asked, "What else?" and Mr. Male then named the proponents as the executors of his will.    Some remark was then made in the room relative to Mary A. Gleason, the half-sister of Mr. Male, and Mr. Marsh asked Male if he desired to remember his half-sister, to which Male responded, "I wish to leave her ten thousand dollars."    Mr. Marsh then asked whether the executors should be empowered to sell real estate, and Mr. Male repiled in the affirmative.    Mr. Marsh then, questioning as to the time within which the power of sale should be exercised, asked if it should be exercised within one year, to which Male replied, "No." The question was then repeated as to whether it should be exercised within two years, and Mr. Male again replied, "No;" and when again repeated as to whether the power should be exercised within three years, he again replied, "No," and added, "Make it five years."

Mr. Male had been very liberal to the Plainfield Public Library, having erected a building for it, and, among other things, given it part of a collection of bric-a-brac, called the "Schoonmaker Collection."    Mr. Baldwin was interested in the library, and, at this point in the questioning, he suggested that Mr. Male should be asked concerning the remainder of the Schoonmaker collection.    Mr. Marsh then asked Mr. Male what he would do with the remainder of that collection of bric-a-brac, and Male replied that he would give it to the public library.

Mrs. Stout then asked if she must leave Male's residence without warning, and Mr. Marsh asked Mr. Male if he desired to remember Mrs. Stout, to which Male answered, "No;" that she had enough; that she should continue in his residence, without paying rent, as long as she lived, and that at her death the residence should go to his nephew, Job Male. Then Mrs. Fenno asked if she was to pay rent for the house belonging to Mr. Male, in which she lived, and Mr. Marsh put her question to Mr. Male, who answered, "No, give her a deed for it." Mr. Marsh then asked Mr. Male if he knew the number of that house, and Male answered, "Yes, 133." Mr. Marsh then asked Mr. Male if he wished the children of his brothers to share equally, and Male replied, "Yes," and then, at the request of Mr. Marsh, he named his five brothers.

While this conversation was progressing, Mr. Marsh made a lead pencil memorandum, of which the following is a copy:

"brothers' children to share equally
9, 11 & 13 College Place & 120 Park Ave. house
to Library

China

John W. Harrison & Job Male, Geo.
W. Fenno, Exrs.
$10,000 to Mary Ann Gleason, my
step-sister.
Power to sell real estate after 5 yrs.
Ornats bric-a brac, all of Schoonmaker
collection.
House and Lot to Job Male, but Mrs.
Stout to have it for home as long as
she lives.

"Mrs. Finno, 133 Bway."

When the conversation was concluded, Mr. Marsh said to the two physicians and Mr. Baldwin, "Mr. Male wants you as witnesses. Is that so, Mr. Male?" To which Male replied, "Yes," and the gentlemen indicated thereupon immediately stepped close to the bed. Then Mr. Marsh, guided by his lead pencil memoranda, recited connectedly the purposes expressed by Mr. Male, and asked Male if that which he (Marsh) had said

was "correct," or "was all," or if it was his "will." Precisely what language Mr. Marsh used at his point, is not agreed to by all the witnesses. The majority of them testify that the question was whether that which was said was his will, but they are contradicted by Mrs. Fenno and her daughter, who insist that the word "will" was not used.

It is now insisted that this acknowledgment by Mr. Male was a testamentary act sufficient to support that which Mr. Marsh then said, and to which Mr. Male assented, as his nuncupative will.

Immediately after this assent Mr. Marsh called for pen and ink, and sat down at a table and rapidly wrote out a will. After he had finished, he read the paper he had written to those assembled in the room, and asked if it accorded with that which Mr. Male had said. It was assented to as correct, and Marsh then added to it the formal attestation clause, and, returning to the bedside, read the written will to Mr. Male and placed a pen in his hand to sign it. During the writing of the will some twenty minutes had elapsed, and Mr. Male had rapidly grown very feeble, so that when the pen was placed in his hand he could not grasp it. Mr. Marsh assisted him by holding and moving his hand, so as to trace his signature upon the paper. After the signature was thus traced, Marsh asked Male to declare the will and his signature, but obtained no response. Mr. Male had become unconscious. All efforts to rouse him were unavailing, and he died within a few minutes. After it was ascertained that he could not be roused, Mr. Marsh declared that the will might be sustained as a nuncupative will, and that if it could not legally stand, it would, at least, cast a moral obligation upon the heirs at law.

If the testimony of the majority of the witnesses, that Mr. Marsh asked Mr. Male whether Marsh's statement of the testamentary purposes was Male's will, is accepted as reliably giving the language then used, it is yet apparent that the sense in which the word "will" was used, is equivocal, in that it is questionable whether it was adopted by Mr. Male as indicative of a present testamentary act, or as a mere expression of assent to the correct-

ness of Mr. Marsh's understanding of the testamentary purpose,. which was to be effectuated by writing.

In solving this question, not only the declaration of Mr. Marsh that the wishes of Mr. Male would be binding morally · upon the heirs if they could not be legally supported as a nuncupative will, coming, as it does, a part of the *res gestœ,* becomes · of importance, and, as well, also, the understanding of the wit-· nesses whom Mr. Marsh called to the bedside.

Dr. Endicott says that he had no thought of any other than a · written will, and that when Mr. Marsh recited, with his eyes upon the memoranda, he thought Marsh was reading a written will which he, the doctor, was to sign as a witness. Job Male· says that he thought that Marsh read from the memoranda, and that he was reading a paper that was to be signed. Dr. Davis · saw the pen and ink and assumed that the will was to be written. He was surprised when Mr. Marsh called them to the bedside. He says, " He called us up suddenly as witnesses ; I didn't know· then what he wanted of us." Mr. Baldwin supposed that the · recitation from the ´memoranda was because of a sensitive desire upon the part of Mr. Marsh to exactly and unmistakably understand the testator's purpose. He says that every one present expected Mr. Male to live long enough to execute a written will. He further says that he understood that the notes were taken for · a will which he presumed would be copied, because he had never · seen a pencil-written will executed. When Mr. Marsh recited, from his notes the witness understood that he was then merely seeking an approval of the notes which he would write out. He · says that he then believed that if Mr. Marsh had anticipated Mr. Male's rapid failure he would have had the notes signed, but · that no one understood that Mr. Male intended to make an· oral will.

The day succeeding Mr. Male's death Mr. Marsh prepared a · statement of the particulars of the transaction referred to, which · was signed by all those who witnessed it except himself.

That statement is as follows :

" We do hereby certify that we were present at the bedside of Job Male for · at least two hours immediately preceding his death, which occurred on Thurs--

Male's Case.

day, January 29th, 1891, at the hour of about 11 P. M., at his residence No. 18 Crescent avenue, in the city of Plainfield; that about two hours preceding his death his lawyer, Craig A. Marsh, was sent for, at the request of Mr. Male, in order to draw his will; that Mr. Marsh arrived about an hour before Mr. Male died; that Mr. Male was asked by Mr. Marsh if he wanted to make his will, and Mr. Male said, 'Yes;' Mr. Marsh asked him how he wanted his property to go, and Mr. Male replied that he wanted the children of his brothers to share equally. He said, 'But first I give the Park avenue house, No. 120 Park avenue, and Nos. 9, 11 and 13 College place to the Plainfield Public Library.' He said, 'I make John W. Harrison, Job Male and George W. Fenno my executors. I give ten thousand dollars to Mary Ann Gleason, my half-sister. I give my executors power to sell real estate, but not before five years after my death. I give the ornaments and bric-a-brac, known as the Shoonmaker Collection, to the Plainfield Public Library. I give this house and lot to Job Male, but Mrs. Stout is to have it for her home without charge as long as she lives; after her death I give it to Job Male. I give the house in which Mrs. Fenno lives, No. 133 Broadway, to her. What is left after the gifts to the public library and to Mary Ann Gleason and Mrs. Stout, I want equally divided among the children of my five brothers, Simon, John, William, James and Ambrose.'

"We were all present when Mr. Male told Mr. Marsh how he wanted his property to go. Mr. Marsh made a pencil memoranda, and after Mr. Male got through telling how he wanted the property to go Mr. Marsh called up Dr. Endicott, Dr. Davis and Dr. Baldwin, and said, 'Mr. Male wants you for witnesses' He asked Mr. Male if that was so and Mr. Male said, 'Yes.' Mr. Marsh then said, 'This is how Mr. Male wants the property to go.' Then he referred to his pencil memoranda, leaning over Mr. Male and repeated what Mr. Male had said, as stated above, and he asked Mr. Male if that was correct. Mr. Male said yes, it was. Mr. Marsh, Dr. Endicott and Dr. Davis and Mr. Baldwin were at this time all grouped about Mr. Male—within a few feet of him. Mr. Marsh said, 'Is that your will?' Mr. Male said, 'Yes.'

"Mr. Marsh then sat down and rapidly drew up a formal will from the pencil memoranda. As soon as he had it finished he read it over to all present in the room, in the hearing of Mr. Male. Then the attestation clause was written at the foot of the paper, and the whole document was then read over to Mr. Male by Mr. Marsh. Mr. Male was partly propped up in bed and took hold of the pen to sign the paper. Mr. Marsh placed his hand over Mr. Male's hand and guided the pen while the name was signed. Mr. Marsh asked Mr. Male if he acknowledged it to be his signature, and the paper to be his last will and testament. Mr. Male had become suddenly worse and made no reply. Mr. Marsh had Dr. Davis, Dr. Endicott and Mr. Baldwin each ask Mr. Male if that was his will. Mr. Male made no reply. Mr. Marsh told the three who were to sign as witnesses that they must be satisfied that Mr. Male understood what he was about, and declared the paper to be his will, before they could sign the attestation clause. As all agreed that Mr. Male was no longer conscious, and as all efforts to arouse him to consciousness failed, the

18

Male's Case.

paper was not witnessed. Mr. Marsh said they would have to rely on the oral will, which would be binding upon the heirs morally, if not legally, as a nuncupative will. Mr. Male died about half an hour later without having recovered consciousness.

"We further testify that at the time Mr. Marsh called up Dr. Endicott, Dr. Davis and Mr. Baldwin to the bedside of Mr. Male and told them, Mr. Male wanted them as witnesses, as above stated, Mr. Male was conscious, and his mind was perfectly clear. He himself gave the numbers of the College place properties, and of the Park avenue property, and of the property on Broadway. When the time at which the executors could sell was discussed, Mr. Marsh asked whether it would answer to give the power at the end of one year from the death of the testator, and Mr. Male said, 'No.' Mr. Marsh suggested two years, and Mr. Male said, 'No.' Mr. Marsh suggested three years, and Male said, 'No; make it five years.' In giving the direction as to Sarah Stout, Mr. Male said that she had all she needed, and he need not therefore leave her any property, except the right to have her home as long as she lived. In naming the executor John W. Harrison, some one said he meant George W. Harrison, but Mr. Male said no, he meant John W. Harrison.

"We further certify that the house in which Mr. Male died was his dwelling-house, in which he had lived for several years last past.

"G. W. ENDICOTT, M. D.,
"A. C. BALDWIN,
"T. S. DAVIS, M. D.

"We certify that the foregoing is true in every respect.
"SARAH STOUT,
"GERTRUDE A. FENNO,
"JOB MALE,
"GEORGE W. FENNO.

"I certify that I arrived as Mr. Male was giving the instructions to Mr. Marsh to give the Park avenue house and College place properties to the Plainfield public library, and remained from that time until Mr. Male died, and what took place from the time I arrived is correctly stated above.
"GERTRUDE FENNO."

Later, Mr. Marsh prepared another written statement of the transaction, which Drs. Endicott and Davis and Mr. Baldwin signed on the 4th of February, 1891. It is as follows:

"We, the subscribers, George W. Endicott, M. D., Thomas S. Davis, M. D., and Augustus C. Baldwin, all of the city of Plainfield, county of Union, and State of New Jersey, do hereby certify, that on the twenty-ninth day of January, eighteen hundred and ninety-one, at about the hour of ten o'clock P. M., and about one hour preceding his death, Job Male, then of said city of Plain-

:field, did pronounce his last will and testament in our presence, and, at the time of so pronouncing the same, said Job Male did bid us, the subscribers who were then and there present, bear witness that such was his will; that said will was made in the time of the last sickness of said Job Male, and in his dwelling-house in said city of Plainfield, in which he had been resident for several years next before the making of such will; that said will pronounced as aforesaid was as follows:

"In reply to a question by Craig A. Marsh to him, he (Job Male) said that he wanted to make his will, and that he wanted the children of his brothers to share equally, and said, 'but first I give the Park avenue house, No. 120 Park avenue, and Nos. 9, 11 and 13 College Place, to the Plainfield Public Library.' He said, 'I make John W. Harrison, Job Male and George W. Fenno, my executors. I give ten thousand dollars to Mary Ann Gleason, my half-sister. I give my executors power to sell real estate, but not before five years after my death. I give the ornaments and bric-a-brac, known as the Schoonmaker Collection, to the Plainfield Public Library. I give this house and lot to Job Male, but Mrs. Stout is to have it for her home, without charge, as long as she lives; after her death, I give it to Job Male. I give the house in which Mrs. Fenno lives, No. 133 Broadway, to her. What is left after the gifts to the public library, to Mary Ann Gleason and Mrs. Stout, I want equally divided among the children of my five brothers, Simon, John, William, James and Ambrose.

"We further certify, that at the time of pronouncing his said last will and testament, said Job Male was of sound and disposing mind and memory, and that we were present continuously from that time until he died.

"In testimony whereof, we have hereunto set our hands and affixed our seals, this fourth day of February, in the year of our Lord, one thousand eight hundred and ninety-one."

Nuncupative wills, as a rule, are not favored by courts, for the very obvious reason that they are at best uncertain productions, depending upon the attention, intelligence, memory and honesty of those who surround a dying testator. Not only may the remembrance of language be defective, but its intended meaning may be misapprehended, and, indeed, loose expressions of desire may, either stupidly or dishonestly, be fabricated into a testamentary act, where such an act was not intended.

Prior to the statute 29 Charles II. c. 3, the courts, guarding against imposition, required, in case of such a will, that it should clearly appear that the testator, at the time of uttering the words relied upon, had a present consistent intention that the very words uttered should constitute his will, and that the witnesses so understood his language. Then the opportunity which the

toleration of such wills afforded for imposition through fraud
and perjury, notwithstanding the care exercised by the courts,
attracted the attention of the law-making power and led to the
strictures of the statute just referred to.

The nineteenth section of that statute recited, that " for pre-
vention of fraudulent practices in setting up nuncupative wills
which have been the occasion of much perjury," be it enacted
that no nuncupative will shall be good where the estate thereby
bequeathed shall exceed the value of £30, that is not proven by
the oaths of at least three witnesses who were present at the
making thereof; nor unless it be proved that the testator, at the
time of pronouncing the will, .did bid the persons present, or
some of them, bear witness that such was his will, or to that
effect ; nor unless such nuncupative will was made in the time
of the last sickness of the decedent and in the house of his or
her habitation or dwelling, or where he or she has been resident
for the space of ten days or more next before the making of such
will, "except where such person was surprised or taken sick, being
from his own home, and died before he returned to the place of
his or her dwelling." And the twentieth section provided that
after six months from the speaking of the words no testimony
should be received to prove any nuncupative will, except the said
testimony, or the substance thereof, were committed to writing
withing six days after the making of the said will. The act
further provided that such a will should not be proved until the
expiration of fourteen days after the testator's death, and then
only after process should be issued to the widow and next of kin,.
in order that they might contest it. Soldiers in service and
mariners at sea were excepted from the operation of the law.

Our act concerning wills, originally passed on November 16th,
1795, adopted the provisions of the statute of Charles II., in the
particulars indicated, almost in the identical language of those
provisions, substituting for £30, $80, and they remain the stat-
ute law of this state to-day. *Pat. L. p. 189; Rev. (1821) p.
223; Rev. Stat. p. 363; Rev. (1877) p. 1245.*

The essentials of these statutory requisites, with the reasons.

for them, are succinctly stated by Sir William Blackstone (*2 Bl. Com. 501*), as follows:

"The testamentary words must be spoken with an intent to bequeath, not any loose, idle discourse in his illness, for he must require the bystanders to bear witness of such his intention; the will must be made at home or among his family or friends, unless by unavoidable accidents, to prevent impositions from strangers; it must be his last sickness, for, if he recovers, he may alter his dispositions and has time to make a written will; it must not be proved at too long a distance from the testator's death, less the words should escape the memory of the witnesses, nor yet too hastily and without notice, less the family of the testator should be put to inconvenience or surprised."

This statutory law was so justly aimed at the prevention of a patent evil, that since it came into existence the courts, in view of its obvious purpose and to give effect to it, have demanded strictness in proof of nuncupative wills in all essential points, whether they be such as show full compliance with the restraints of the statute or such as establish facts fundamentally indispensable to the probate, independently of the statute. Hence, the testamentary capacity of the decedent, the *animus testandi* at the time of the alleged nuncupation, and the bidding of those present, or some of them, to bear witness that such is his will, or to that effect, technically called the *rogatio testium*, which is evidence both of the *animus testandi* and the intent to nuncupate, are required to appear by the clearest and most indisputable testimony. *Lemann* v. *Bonsall, 1 Add. 389; 1 Wms. Ex. 121, 122; Schoul. Wills § 377; 1 Redf. Wills 187; Dorsey* v. *Sheppard, 12 Gill & J. 192; Woods* v. *Ridley, 27 Miss. 119; Yarnall's Will, 4 Rawle 46.*

The statute does not require a fixed form of speech for the *rogatio testium*. Its whole scope and policy is to provide a method in which a will may be made by one *in extremis* when there is not time to resort to writing, and it is not expected that such a person will be able to use the exact words of the statute. Hence, the express license given to use words to the effect of those used in the law itself. The English statute did not expressly require that the bidding of the persons present to witness should be by words. It required a bidding " or to that effect." Our statute interpolates after the word " or " the word " words,"

so that its text reads "or words to that effect." Its license
extends only to a change from the words of the statute to expres-
sions of the testator in other language which convey the same
meaning. It is essential, then, to the validity of a nuncupative
will that the testator shall, by his own language, indicate to
those about him, or some of them, that they are to witness that
the very words he is about to utter will constitute his last testa-
ment. The main purpose of this vitally essential requirement is
to provide for a marked distinction between loose declarations,
casual conversations, admissions as to testamentary intentions
extracted by surrounding friends, or instructions for a formal
written testament and the testamentary act itself, and to prevent
the former from being passed off as that act. In short, its office
is to fix a clear boundary between the conditions of testacy and
intestacy.

It is beneficent in protecting the next of kin from the danger
apparent in a verbal will, made up from declarations extracted
by questions from a feeble, dying man, by requiring a certain
degree of intelligent freedom of action, and thus affording evi-
dence of spontaneity and volition which might not otherwise be
had.

Even under the English statute, I find that the ecclesiastical
courts did not consider the *rogatio testium* to exist, unless it ap-
peared in the testator's own language.

In *Parsons* v. *Miller*, *2 Phillim. 194,* the decedent was at-
tended by Mary Parsons, who inquired if he had settled his
affairs; he replied that he had not made a will, and was too ill
to do so; she asked if there was anything he would have done
and she would see it done; he began at once to repeat the words
urged as his will, but without desiring her to bear witness. She
then, thinking it necessary to have another witness, said that she
would call up Mary Carter that she might hear and be a witness,
to which he answered, "Do." Mary Carter was called, and
then Parsons bid him repeat, which he did. Sir William
Wynne said: "This is a *rogatio testium*, but not by the testator.
I cannot hold here *qui facit per alium facit per se.*" He also
instanced the case of *Sawyer* v. *Silversides*, before Sir George

Hay, in 1767, where the decedent was asked if he had made a will and he replied, " No," and was told he could make a verbal will if there were a sufficient number of witnesses present, and replied that he knew it, and then uttered the words alleged to constitute the will.    The court said that it " was tied down by the statute, and it did not appear that the deceased addressed himself in any such manner as was required before the words were spoken." In *Bennett* v. *Jackson, 2 Phillim. 190,* the decedent summoned several of her children, and the daughter of the person with whom she lodged, to her bedside and declared that one of her sons was to be her heir and have all that she had. Afterwards she said that her declaration should be committed to writing, but then added that it would answer the same purpose. Later she chided the daughter of her landlady for leaving the room, as she desired her to witness her declarations. Sir John Nicoll said: " There is no *rogatio testium* at the beginning; no declaration that the words were spoken with the intent of making a will at the time. The words of the statute are very strong and must be held strictly."

This wise requirement of the statute, as suggested by Chancellor Zabriskie in *In re Hebden's Will, 5 C. E. Gr. 473, 477,* enters into the well approved definition of a nuncupative will, which is: " When a man lieth languishing for fear of sudden death, dareth not stay the writing of his testament, and, therefore, he prayeth his curate and others to bear witness of his last will, and declareth by word what his last will is." *Perkins* § *476; Bac. Abr. 305, " Wills D;" Prince* v. *Hazleton, 20 Johns. R. 502, 511.*

Against the admission to probate of the matter here offered as the will of Job Male, it is urged, *first,* that when the words were uttered there existed in Job Male no intent to nuncupate—that is, intention of the mind that those very words should constitute his will; and, *second,* because there was no *rogatio testium,* bidding persons present to bear witness that those words were his will, or words of that import.

That a written will was contemplated when Mr. Marsh was sent for and commenced to converse with Male, there can be no

doubt. Two of the witnesses testify that Mr. Marsh announced to Mr. Male that he had come to "*draw*" a will, and the written statement of the transaction, prepared by Mr. Marsh the next day, affirms that Marsh had been sent for to "*draw*" Male's will. After his remark that he had come to draw a will, Marsh produced pencil and paper and sat down in the attitude of one prepared to write instructions, and each subsequent question and answer in the transaction suggested instruction for a future act rather than the act of will-making itself. Perhaps the expressions most strongly indicative of mere preparatory instruction are, the reply to the last question concerning the power of sale in the executors, where Mr. Male said, "*make it* five-years,"·and the answer to that which was said about Mrs. Fenno paying rent, when he said, "No, *give her a deed* for it." These expressions were addressed by Mr. Male to his lawyer, who was called for the express purpose of drawing a will, and they were in terms which required an intervening act upon the part of that lawyer to effectuate Mr. Male's purpose. Indeed, if that which he said in reference to the house occupied by Mrs. Fenno was not the inaccurate wandering of the mind of a dying man, Mrs. Fenno was to be provided for by deed and not by will. Throughout the entire transaction there was an utter absence of language at all indicative of a present testamentary action.

I am unable to perceive the least foundation in the conversation for a claim that there existed in the mind of Mr. Male the purpose that the very words he then spoke should be his will.

But it is claimed that when Mr. Marsh said to the physicians and Mr. Baldwin that Male wished them to be witnesses, and asked Male if that was so, and upon Male's affirmative reply recited, with the assistance of his memoranda, and obtained an assent to that which he so recited, that there was a complete nuncupative will.

Is this position tenable?

At the very outstart of an examination of it, it appears that that to which Male assented is unknown, uncertain, disputable. Did he assent that the very words which Marsh said constituted his will? Or did he assent that they indicated a correct appre-

Male's Case.

hension of the instructions that he had given for his will? If the word "will" was used, did the testator not understand the question to mean, "Is this your will as you propose to make it?" In this sense Mr. Marsh evidently understood it, for he immediately called for pen and ink and commenced to prepare a formal written will. The court cannot, by favorable conjecture as to the sense in which Mr. Male understood this word, in order to give effect to his wishes, sustain the complainant's position. The intent to nuncupate must be established unequivocally by clear and indisputable evidence, and so also must it be made to appear that the witnesses, at the very time of the nuncupation, understood that the testator was in the act of nuncupating.

The situation of this case exhibits the wisdom of the statutory requirement that the testator shall bid persons present bear witness that the words uttered are themselves his will, for the clear appearance of such a bidding would distinguish whether that which is now urged as a nuncupative will was mere instruction or a formal testamentary act. Does a *rogatio testium* appear in Mr. Marsh's statement, "Mr. Male wants you for witnesses," and Mr. Male's assent to it? Witnesses for what? That the instructions were accurately understood? Or, witnesses of a written will that Mr. Marsh was about to prepare? Or, witnesses of a nuncupation? It does not appear that Mr. Male called them to the bedside or even desired them to approach it. Every indication is that Male's purpose then was to make a written will. Was it not of such a will that he wished them to be witnesses? And was not his assent to Mr. Marsh's question a mere nomination of the witnesses of his proposed written will? I do not find anything in the question which could intimate to the witnesses that Mr. Male intended to nuncupate. Each of the witnesses denies that it suggested such a thought to him.

I need hardly suggest, in addition, that the words were not those of Mr. Male, exhibiting spontaneity and volition, as the statute requires.

It is plainly impossible, without disregarding the design and meaning of the statute, to hold that there existed a *rogatio testium*.

A noteworthy evidence that Mr. Male did not intend to make a nuncupative will appears in the fact that he contemplated the disposition of real estate, a thing that could not be lawfully accomplished by such a will. *4 Kent Com. 503, 516; 3 Washb. Real Prop. (5th ed.) 535; Schoul. Wills § 15; 2 Bl. Com. 373, 501; 1 Wms. Ex. 116; Porter's Appeal, 10 Pa. St. 254; Smith* v. *Thurman, 2 Heisk. 110.* He is to be presumed to know this condition of the law, and, if he did not know it, the fact that Mr. Marsh did not suggest the illegality, points strongly to the conclusion that Marsh did not interpret, from anything that was said or anything that was done in his presence, that a nuncupative will was intended.

After Mr. Marsh completed the written will, he read it first to those assembled in the room, and then, having their approval of his production, added an attestation clause, and read the will again to Mr. Male, who made no remark either of approval or disapproval. The pen was placed in his hand and guided over the paper, but it cannot, with any satisfaction, be said that he then understood that which transpired about him.

At this point, my attention is called to the decisions in several states which hold that wills written according to instruction, but unexecuted, because of the intervention of death before it was expected, may be sustained as nuncupative wills.

Among those cases are the following :

*Mason* v. *Dunman, 1 Munf. 456,* where the decedent sent for his neighbor to make his will, who took notes thereof in the presence of the deceased and another person, yet another person coming in as the latter parts of the notes were dictated. Part of the notes, at least, were read over to the decedent, and then a draft of a written will was made from the notes, but when the draft was finished the deceased was delirious and he died without recovering consciousness; *Offutt* v. *Offutt, 3 B. Monr. 162,* where the decedent had a will made in writing in his presence, which was read to and approved by him while he was of sound and disposing mind, yet died before he could sign the will or have the witnesses attest it under his observation, and *Phœbe* v. *Boggess, 1 Gratt. 129,* where a decedent *in extremis* requested

another to write his will.    The will was finished and read to the deceased in the presence of three witnesses, and approved by him. The decedent then attempted to sign, but complained that he could not see, and requested the scrivener to sign for him, and, as the scrivener was signing, became unconscious and soon died.

In each of these cases the court sustained the documents as nuncupative wills, substantially laying it down as a rule that a paper not perfected as a written will may be established as a nuncupative disposition if its non-completion in the form contemplated resulted from the act of God or other cause than an intention to abandon or postpone the consummation of it according to law, provided there be proof of the testamentary declarations by the requisite number of competent witnesses who were present when the declarations were made.

In *Porter's Appeal, 10 Pa. St. 254,* Mr. Justice Coulter says upon this subject : " No case was produced in the argument,. either from the English or American books, where it was held that a decedent who intended to make a written will, which, for any cause, was left incomplete or unfinished, died testate by nuncupation of the unfinished will.    I have met with but one case,. that of *Offutt* v. *Offutt, 3 B. Monr. 162,* where it was ruled that a paper not perfected as a written will may be established as a nuncupative will where its completion is prevented by the act of God.    But this depended much upon the peculiarity or rather distinctive character of the Kentucky statute.    But even that case does not fit the one. in hand, which, as I think is evident from the testimony, was not prevented from being completed by the act of God.    But I doubt very much the fitness of that rule in this state, which doubt is strongly confirmed by no such English case being produced in the long line of their authorities since the enactment of 29 Charles II."

As to this same class of cases Chancellor Zabriskie, in the *Hebden Will Case, supra,* says : " I am aware that there are cases in several of the states in which written instructions have been admitted to probate as nuncupative wills.    It may be that the statutes of these states require such action ; but, if they do not, I am not willing to hold that written instructions can constitute a

nuncupative will in face of the statute requiring written wills
to be signed, introducing a new rule that declared invalid such
instructions which had before been proved as written, not as nun-
cupative, wills."

The confidence with which these cases have been urged before
me has led me to examine with some care the course of decision
in the English ecclesiastical courts prior to the enactment of *1
Vict. c. 26 (1837)*, which provided that no will should be valid
unless it should be in writing and executed in a manner therein
prescribed, and subsequent to the Statute of'Frauds, *29 Chas.
II. (1676)*, which required that devises and bequests of land
should be in writing, signed by the testator, or some one author-
ized by him, and attested by three or four witnesses, or else be
utterly void and of no effect, and pronounced the restrictions
touching nuncupative wills, to which I have referred. And I
have concluded that the decisions of those courts clearly and con-
sistently hold the principles already stated with reference to nun-
cupative wills. With respect to written wills of personalty, they
hold that writings which were clearly shown to be intended by
the decedent to express his testamentary intentions at the time of
his death, should be admitted to probate as good dispositions of
personalty when disentangled from dispositions of real estate,
whether they were written by the hand of the testator or not, or
signed or attested or not. *Rymes v. Clarkson, 1 Phil. 22; Bone
v. Spear, 1 Phil. 345; Read v. Phillips, 2 Phil. 122; Constable
v. Steibel, 1 Hagg. 56; Maclea v. Ewing, 1 Hagg. 317; Wood v.
Medley, 1 Hagg. 661; Fulleck v. Allinson, 3 Hagg. 527.* And if
the paper contained the disposition of the property to be made
after death, it was admitted to probate even though it were meant
to operate as a settlement or a deed of gift or bond, and not as a
will. *Masterman v. Maberly, 2 Hagg. 235.* Also, that instruc-
tions for a will, written during the lifetime of the testator, might
take effect as a will if the testator was prevented by death from
executing a formal will. *Goodman v. Goodman, 2 Lee 109;
Robinson v. Chamberlayne, 2 Lee 129; Brown v. Hallett, 2 Lee
418; Green v. Skipworth, 1 Phil. 53; Huntington v. Hunting-
ton, 2 Phil. 213; Sikes v. Snaith, 2 Phil. 351; Musto v. Sut-*

*cliffe, 3 Phil. 104; Lewis* v. *Lewis, 3 Phil. 109; Nathan* v. *Morse, 3 Phil. 529; Allan* v. *Manning, 2 Add. 490.* But no such paper was regarded as a nuncupative will, for the intent to nuncupate was absent.

In *Nathan* v. *Morse, supra,* Hugh Morse dictated instructions to his solicitor, who wrote them, and when he reached the clause by which he appointed his executors, he died. Immediately one Joseph, who was present during the giving of the instructions, asked that the instructions be read over to him, and, as they were read, called attention that a legacy pronounced had been omitted. The solicitor, recognizing his omission, added the legacy to that which he had written. Sir John Nicoll, upon this state of facts, said : "I have no doubt in pronouncing this to be the will of the deceased, as far as the appointment of the executors ; but it is perfectly clear that the other part was not committed to writing during the life of the deceased. Although the court goes to the utmost length to give effect to intention clearly proved and reduced into writing in the lifetime of the testator, yet it has never held that anything added to a will after death can be established. Death consummates the instrument ; nothing can be added afterwards."

Taking the distinction between such a written will and a nuncupative will, the same distinguished judge, in *Sikes* v. *Snaith, supra,* says : "On the point of law that a paper can be pronounced for, which had never been seen by the deceased or read over to him, I have no doubt. This principle was recognized in the case of *Wood* v. *Wood,* in which all the necessary instructions having been given by the deceased, and reduced into writing in his lifetime, probate was given of so much of the paper as were shown by evidence to be exactly conformable to the instructions. *It is essential that it should be written in the lifetime; otherwise it would be a mere nuncupative will, and then of no effect under the statute."*

The addition of an attestation clause to such an unsigned and unattested document was presumptive evidence, in those courts, that the testator did not mean the paper to be a finality until something more was done, and probate was denied unless that

presumption was rebutted. It was usually rebutted by showing that the indicated execution was not intended, or was not had by reason of the intervention of some preventive cause, such as the sudden death of the testator—the act of God.

Thus it appears that before the act of *1 Vict. c. 26,* the act of God preventing the preparation of a formal will, opened the door for the admission to probate of instructions for such a will which had been reduced to writing while the testator was yet alive, or the formal will itself when completed save in signing a written attestation.

If the decisions of the states to which I am referred do not rest upon some local statute, I am constrained to believe they must spring from confounding the practice under which instructions reduced to writing in the life of the testator were formerly admitted to probate, with nuncupative wills, for it is impossible to conceive of any reasonable interpretation of the statute of Charles II., by which they may be supported.

" It is a perversion of language," said Mr. Justice Woods, in *Dockum* v. *Robinson, 6 Fost. (26 N. H.) 372,* " and a confusion of thought, that directions to another to draw up a will in form for publication, is itself a published will. The party himself cannot be supposed to think that he is thereby performing a final act. In the very expression of his purposes, and giving his commands, is involved the condition that the proposed disposition of his property shall not take effect, but in one particular form and manner that he has indicated."

Until the supplement in our act concerning wills, approved March 12th, 1851 (*P. L. p. 218, Rev. p. 1247*), wills of personalty in writing, unsigned and unattested, were admissible to probate, but that act changed the law, as did the act of *1 Vict. c. 26,* in England, so that now, in this state, all wills, save nuncupative wills executed with the formalities already stated, must be signed and attested in writing.

I am most clearly of the opinion that neither the declarations here testified to, nor the writings produced, can be admitted to probate as the will of Job Male.

Male's Case.

This conclusion renders it unnecessary for me to critically examine the questions suggested by counsel for the contestants, touching volition and spontaneity requisite in a testator to enable him to make a nuncupative will, and as to the effect of the suggestions and interrogatories to Mr. Male at the instance of those who surrounded him, when the matter here offered as his will was had. It will suffice to say that it appears to me to be plain that merely suggestive remarks and questions, which do not impose upon the testator by confusing him and defeating his purpose, or by constraining him to do that which he would not in their absence have been willing to do, will not defeat a nuncupative will. The validity of the disposition of property produced by question and answer must depend largely upon the circumstances and conditions which surround the transaction. It is readily perceptible that disconnected, off-hand, monosyllabic answers by a feeble, dying man to pestering questions at the instance of greedy relatives and friends, who surround him in his last moments, upon whom he is dependent for the little comforts he may yet have, should be most jealously scrutinized when they are offered for probate as a nuncupative will. A written will, also, thus produced, would naturally be closely scrutinized; but its advantage would lie in the fact that at the formal execution there would be an opportunity for reconsideration, in concrete mass, of the substance drawn out by the questions and suggestions. In *Green* v. *Skipworth, supra,* where questions and answers, written while the testator was yet alive, were offered for probate as a written will, Sir John Nicoll says: "A will made by interrogatories is valid; but, undoubtedly, wherever a will is so made, the court must be more upon its guard against importunity, more jealous of capacity and more strict in requiring proof of spontaneity and volition than it would be in an ordinary case. But if there is clear capacity, if there is the *animus testandi,* and if the intention is reduced to writing the court must pronounce for it."

In *Dorsey* v. *Sheppard, 12 Gill & J. 192,* where there was a nuncupative will, the court approved the language of Sir John Nicoll just quoted.

The prayer of the petition will be denied.